

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7761 | **DATE** | 2/13/2003 |
| **CASE TITLE** | Linda Tarrson vs. BLC Partners, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Defendants' renewed petition to compel arbitration and to stay litigation [7-1] is granted. The case is stayed pending resolution of the arbitration.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 2 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | FEB 14 2003 | |
| | Notified counsel by telephone. | | date docketed | 19 |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 2/13/2003 | |
| | | 03 FEB 13 PM 4:22 | date mailed notice | |
| MD | courtroom deputy's initials | | MD | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LINDA TARRSON, )
)
    Plaintiff )
)
vs. ) No. 01 C 7761
) Judge Joan H. Lefkow
BLC PARTNERS, LP, BALIS, LEWITTES )
& COLEMAN, INC., COLEMAN CAPITAL )
MANAGEMENT LLC, )
MATHEW COLEMAN, SR., )
MATHEW D. COLEMAN, JR., and )
DAVID J. DOERGE, )
)
    Defendants. )

## MEMORANDUM OPINION AND ORDER

Before the court is the renewed petition of defendants, Balis, Lewittes & Coleman, Inc. ("BLC, Inc."), Mathew Coleman, Sr. ("Coleman") and David Doerge ("Doerge") (collectively, "movant defendants"), for an order to compel plaintiff Linda C. Tarrson ("Tarrson") to arbitrate her claims before the National Association of Securities Dealers ("NASD") and to stay the instant litigation pursuant to 9 U.S.C. §§ 1 *et seq.*[1] The court's jurisdiction rests in 28 U.S.C. § 1331 (federal question) and § 1367 (supplemental jurisdiction). For the reasons set forth below, the court grants the petition.

---

[1] Although movant defendants did not formally file a renewed petition, the defendants sought reconsideration of their original petition after a petition to compel arbitration in New York was made, as this court had directed, and denied.

## BACKGROUND

BLC, Inc. is incorporated in New York with its principal place of business there as well. It is a member of NASD and, along with non-movant defendant Balis, Lewittes & Coleman, LP ("BLC, LP"), held itself out as the Investment Manager of non-movant defendant BLC Partners ("Partners"), a limited partnership. (Compl. ¶ 11.) BLC, Inc. was responsible for making investments for Partners and for establishing policies and procedures to achieve Partners' business objectives. (*Id.*) Coleman was a Vice President of BLC, Inc. as well as the Fund Manager and an advisor for Partners. (Compl. ¶ 12.) Doerge is a registered representative/investment advisory representative of BLC, Inc. and is responsible for the business affairs of Doerge Capital, a division of BLC, Inc. (Compl. ¶ 13.)

In early 1995, Doerge formed Doerge Capital as an investment business. (Compl. ¶ 24.) Doerge solicited Tarrson, a former client of his when he worked at Goldman Sachs & Co., to invest with Doerge Capital. In March 1995, Tarrson moved almost $1 million dollars of her assets from Goldman Sachs & Co. to Doerge Capital. (Compl. ¶ 25.) Around that same time, on or about February 23, 1995, Tarrson also opened a brokerage account with Bear Stearns Securities Corporation ("Bear Stearns") through BLC, Inc., the introducing broker. (Pet. ¶ 1.) In opening her account, Tarrson signed a Customer Agreement (the "Agreement") with Bear Stearns. The Agreement provides, in relevant part, "YOU AGREE, AND BY MAINTAINING AN ACCOUNT FOR YOU BEAR STEARNS AGREES, THAT CONTROVERSIES ARISING BETWEEN YOU AND BEAR STEARNS, . . . SHALL BE DETERMINED BY ARBITRATION[,]" (Def. Ex. B, ¶ 21) and that:

2

> Bear[] Stearns . . . carries your account(s) as clearing agent for your broker.
> Unless Bear[] Stearns . . . receives from you prior written notice to the contrary
> [Bear Stearns] may accept from such other broker, without inquiry or
> investigation: (a) orders for the purchase or sale of securities and other property in
> your account(s) on margin or otherwise and (b) any other instructions concerning
> your account(s) or the property therein. . . . You agree that your broker [(BLC,
> Inc.)] and its employees are third-party beneficiaries of this Agreement, and that
> the terms and conditions hereof, including the arbitration provisions, shall be
> applicable to *all matters* between or among any of you, your broker and its
> employees and Bear Stearns and its employees.

(Ex. B, ¶ 8 (emphasis added).)

Throughout the next five to six years, defendants, mainly Doerge, persuaded Tarrson to invest in Partners, to the tune of approximately $2 million of Tarrson's assets from October 1997 to June 2000. (Compl. ¶ 31.) Tarrson's monies in Partners came mainly from an account she maintained with BLC, Inc. and Doerge Capital. (For example, see Comp. ¶¶ 11, 38(d), 59.) On or about October 23, 2000, defendants informed Tarrson that Partners was liquidating. (Compl. ¶ 76.) Subsequently, Tarrson learned that her approximately $2 million investment in Partners was worth $674,607.37. (Compl. ¶ 77.) On Partners' liquidation, Tarrson instructed BLC, Inc. and non-movant defendant Mathew Coleman, Jr. to transfer any and all of her assets held by Partners, Doerge Capital, or BLC, Inc. to her brokerage account with Bear Stearns. (Compl. ¶ 83.) Coleman, non-movant Mathew Coleman, Jr. and/or Doerge, contrary to Tarrson's directions, opened a new account in Tarrson's name with BLC, Inc. in December, 2000 and placed $400,000 from Partners' liquidation in that account. (Compl. ¶ 84.) Not until on or about July 17, 2001 did BLC, Inc. finally transfer monies from Partners' liquidation to Tarrson's Bear Stearns account and they only transferred $374,716.93, approximately $300,000 less than what Tarrson was entitled to receive from Partners' liquidation. (Compl. ¶¶ 85-86.) BLC, Inc. and

3

Doerge also did not transfer funds from another portfolio Tarrson held with Doerge Capital to her Bear Stearns account until July 17, 2001. (Compl. ¶ 87.) On or about October 9, 2001, Tarrson filed her civil complaint in the Northern District of Illinois against defendants. Tarrson's action arises from defendants' alleged misrepresentations and omissions to her in connection with her investment in Partners, resulting in losses exceeding $1 million. Movant defendants BLC, Inc., Coleman and Doerge subsequently moved to compel Tarrson to arbitrate her claims according to the Agreement's arbitration clause[2] and to stay the instant litigation. On September 18, 2002, the court denied movant defendants' motion to compel because movant defendants sought to arbitrate in New York, New York and the court determined, subject to the Agreement's forum selection clause, only a district court in New York could compel arbitration. The court, however, stayed the instant litigation to allow movant defendants to pursue arbitration. Movant defendants now renew their motion to compel arbitration and stay the instant litigation but seek arbitration with NASD, presumably with a NASD office located in the Northern District of Illinois.

## DISCUSSION

### A. Petition to compel arbitration

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, enables a party to invoke the authority of a court to enforce an arbitration agreement by compelling the reluctant party to arbitrate a dispute. Section 4 provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district

---

[2] Movant defendants also moved to arbitrate the claims according to the "BLC Partners, L.P. Subscription Agreement and Suitability Statement" ("the Subscription Agreement"). The court, however, disregards the Subscription Agreement as further evidence of an agreement to arbitrate between the parties because there is no evidence that Tarrson signed it and her complaint goes towards defendants' failure to produce documents, including the Subscription Agreement. (Pl. Resp. at 4-5.)

4

court that, save for such agreement, would have jurisdiction under Title 28, in a civil action . . . of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.

9 U.S.C. § 4. The court has jurisdiction of this matter since it would otherwise have jurisdiction under 28 U.S.C. § 1331 (federal question).

The FAA provides that an arbitration clause in a "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "[W]hen a contract contains an arbitration clause, a strong presumption in favor of arbitration exists and courts have no choice but to order arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *CK Witco Corp. v. Paper Allied Indus., Chem. & Energy Workers Int'l Union*, 272 F.3d 419, 421-22 (7th Cir. 2001) (internal citations and quotations omitted). The court will enforce an arbitration agreement if (1) a valid agreement to arbitrate exists and (2) that agreement covers the underlying dispute. *See We Care Hair Dev., Inc. v. Engen*, 180 F.3d 838, 844 (7th Cir. 1999).

With respect to the former, the parties do not dispute that a valid agreement exists.[3] They do disagree whether the Agreement covers the underlying dispute. "The Supreme

---

[3]Tarrson, however, does argue that the Agreement's "adhesive nature . . . lends further support to [her] interpretation of [the Agreement's] intended scope[,]" which may possibly be construed as an argument that a valid agreement does not exist. (Pl. Resp. at 3.) Tarrson cites *Caldwell v. KFC Corp.*, 958 F. Supp. 962, 974-75 (D.N.J. 1997), where the court held that the parties' employment agreement was a contract of adhesion because the plaintiff, who had an 11th grade education and a criminal record, "would not have reasonably understood that in signing the KFC employment application he was agreeing to arbitrate a future statutory civil rights claim for retaliatory termination." *Id.* at 975. The standard, which was applied in *Caldwell*, is not whether "a reasonable person" in the

5

Court has explained that the FAA 'established that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Kiefer Specialty Flooring, Inc.* v. *Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999), quoting *Moses H. Cone Mem'l Hosp.* v. *Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). "[The] plaintiff bears the burden of establishing that the arbitration clause is unenforceable." *Stewart* v. *Molded Plastic's Research of Ill., Inc.*, No. 01 C 4232, 2001 WL 1607464, at *1 (N.D. Ill. Dec. 17, 2001), citing *Shearson/Am. Express, Inc.* v. *McMahon*, 482 U.S. 220, 226-27 (1987) ("The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue.").

Defendants read the arbitration clause broadly such that the Agreement extends to "all matters *without exception*" (Def. Mem. at 5; Reply at 4 (emphasis in original)) and cites numerous cases where courts have granted motions to compel arbitration based on similar arbitration clauses. See *Cricchio* v. *Dyckman*, 82 F. Supp. 2d 626, 629, 631 (E.D. Tex. 2000) (compelling arbitration based on a clause pertaining to "all controversies" between the plaintiff and Bear Stearns and "all matters" between the plaintiff and the defendant-brokers even though monies for the investment leading to the litigation apparently came from "a different account" (The facts do not indicate whether this account was maintained by Bear Stearns or whether defendants were the brokers)); *see also Konits* v. *Bear, Stearns Sec. Corp.*, No. 98 C 8364, 2000 WL 52521, at *3 (S.D.N.Y. Jan. 24, 2000) (compelling arbitration between Bear Stearns and the plaintiffs who had brokerage accounts with an independent broker-dealer that cleared its business

---

plaintiff's position "in 1995 would have [known] that she would be agreeing to arbitrate" but whether Tarrson would have known. (Pl. Resp. at 4.) There is no record evidence to support this position.

through Bear Stearns based on the broad language that the parties agreed to arbitrate all "controversies" arising from transactions in the Bear Stearns accounts); *R. Allen Fox, Ltd.* v. *Stratton Oakmont, Inc.*, No. 93 C 2228, 1993 WL 433777, at *2-4 (N.D. Ill. Oct. 25, 1993) (compelling arbitration between the plaintiffs and the defendants-brokers based on a similar agreement with Bear Stearns).

Tarrson, however, argues that the instant case "does not relate in any way to the [Agreement] or the account opened [with Bear Stearns under] that Agreement" (Pl. Resp. at 1) and that defendants do not show that her investment in Partners "cleared" through Bear Stearns (Pl. Resp. at 3). Tarrson relies on *Coors Brewing Co.* v. *Molson Breweries*, where the court interpreted an arbitration agreement that extended only to matters "arising in connection with the implementation, interpretation or enforcement of" the agreement or to matters "related to the sales contract" and held that the plaintiff's antitrust claims related to the parties' licensing agreement concerning confidential and proprietary information were arbitrable whereas the plaintiff's antitrust claims concerning matters outside of the parties' licensing agreement such as market concentration were not arbitrable. 51 F.3d 1511, 1515-18 (10th Cir. 1995); *see also Hill's Pet Nutrition, Inc.* v. *Fru-Con Constr. Corp.*, 101 F.3d 63, 66 (7th Cir. 1996) (determining that the arbitration clause extended to "any dispute, claim or action relating to this Agreement" but finding that the dispute was not arbitrable because the dispute went to the interpretation of terms that the parties left open and did not agree to pass onto an arbitrator).

Recently, Judge Amy St. Eve of this court denied some of the same defendants' petition for an order to compel arbitration based on virtually the same agreement. *Stone* v. *Doerge*, No. 02 C 1450, 2002 WL 31307422, at *5 (N.D. Ill. Oct. 15, 2002) (a case that was reassigned from

7

the undersigned to Judge St. Eve).[4] The court determined that the scope of the arbitration agreement did not include "disputes not involving Bear Stearns or disputes where Bear Stearns did not maintain accounts and did not act as clearing agent," but rather was limited to disputes relating to accounts maintained by Bear Stearns. *Id.* at *4. Bear Stearns did not serve as the clearing agent for the sales to the plaintiff by the defendants (which did not appear to include Partners according to the plaintiff's complaint) of private investments that gave rise to the litigation. *Id.* at *3-5. Relying in part on *Coors*, 51 F.3d at 1516,[5] Judge St. Eve concluded that the arbitration agreement did not cover the sale of the private investments. *Id.* at *4.

Here, BLC, Inc. introduced Tarrson to Bear Stearns, Bear Sterns maintained Tarrson's accounts and Tarrson's monies for her investment in Partners came to Bear Stearns from her account with Doerge Capital, a division of BLC, Inc. (For example, see Comp. ¶¶ 11, 59.) While the complaint is painstaking not to mention Bear Stearns, the facts before the court unlike the facts in *Stone*, point to the inference that Bear Stearns acted as a clearing agent for the monies for Tarrson's investments in Partners until the relationship deteriorated into the situation giving rise to this law suit. Thus, the Bear Stearns account is related to the underlying dispute.

Nevertheless, Tarrson makes additional arguments as to why this litigation is not subject to arbitration, namely, (1) the NASD rules only allow arbitration between NASD members and the non-movant defendants are not members (Pl. Supp. Resp. at 2), (2) the Agreement applies

---

[4] Remarkably, movant defendants, whose counsel also represent some of the defendants in *Stone*, did not bring this case to the court's attention.

[5] The court quoted the *Coors* court's hypothetical, "[I]f two small business owners execute a sales contract including a general arbitration clause, and one assaults the other, we would think it elementary that the sales contract did not require the victim to arbitrate the tort claim because the tort claim is not related to the sales contract." *Stone*, 2002 WL 31307422, at *4.

only to the "introducing broker," and (3) the anti-waiver provision of section 29(a) of the Securities Exchange Act of 1934, 15 U.S.C. 78cc(a),[6] (and section 14 of the Securities Act of 1933, 15 U.S.C. § 77n[7]) renders the arbitration clause void. With respect to (1) and (2), the movant defendants show that the non-movants defendants may arbitrate their dispute with Tarrson before NASD, citing NASD Rule 10101[8] and 10314(d),[9] and by providing examples of other arbitrations involving non-members. (Def. Resp. to Pl. Supp. Resp. at 1-2.)

With respect to (3), Tarrson's assertions that arbitration is barred by the anti-waiver provisions require a closer look. Tarrson argues that she is presenting an issue of first impression that "the dramatically low customer recovery rates" in arbitration under self-regulatory organizations ("SROs") such as NASD violate the anti-waiver provisions of the securities laws. (Pl. Supp. Resp. at 7.) Tarrson tracks the Supreme Court's interpretation of how mandatory

---

[6]Section 29(a) of the Securities Exchange Act of 1934 provides:

Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or any rule or regulation thereunder, or of any rule or an exchange required thereby shall be void.

15 U.S.C. § 78cc(a).

[7]Section 14 of the Securities Act of 1933 provides:

Any condition, stipulation, or provision binding any person acquiring any security to waive compliance with any provision of this subchapter or of the rules and regulations of the Commission shall be void.

15 U.S.C. § 77n.

[8]NASD Rule 10101 provides that any matter "between or among members or associated persons and public customers, *or others*" is eligible for submission to arbitration. (Emphasis added).

[9]NASD Rule 10314(d) provides, in relevant part, that:

... All persons may be joined in one action as respondents if there is asserted against them, jointly or severally, any right to relief arising out of the same transaction, occurrence, or series of transactions or occurrences and if any questions of law or fact common to all respondents will arise in the action.

9

arbitration clauses comport with the anti-waiver provisions, citing *Wilko* v. *Swan*, 346 U.S. 427, 435 (1953) (determining enforcement of mandatory pre-dispute arbitration agreements weakened the customers' ability to recover under the Securities Act of 1933, 15 U.S.C. §§ 77a *et seq.*, and holding Congress intended that such agreements were violative of the anti-waiver provision), *McMahon*, 482 U.S. at 238 (declining to extend *Wilko* to the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and holding the Securities and Exchange Commission ("SEC") had "sufficient authority to ensure that arbitration is adequate to vindicate" the customers' rights under securities laws; therefore, the arbitration agreements did not violate the anti-waiver provision), and *Rodriguez De Quijas* v. *Shearson/Am. Express, Inc.*, 490 U.S. 477, 484-86 (1989) (overruling *Wilko*). Tarrson derives from the cited cases that the SEC does not review the results of SRO arbitration. Tarrson relies on "post-*McMahon*" data from the Securities Arbitration Commentor, Inc. ("SAC") and a General Accounting Office Report from 1992 on securities arbitrations to argue that claimants fare better in courts than arbitration proceedings, particularly with regards to claimants who sought over $1 million in compensatory damages. (Pl. Supp. Resp. Exs. C and D.) Although customer recovery rates through arbitration, coupled with lack of oversight by the SEC, may indicate that arbitration is not advantageous to investors, in the end, Tarrson has not shown how this court may disregard well-established Supreme Court precedent based on her data.

Accordingly, the court will grant defendants' motion to compel arbitration.

**B.      Petition to stay litigation**

Defendants also petition the court to stay the litigation. As a threshold matter, although not all the parties in the instant case are parties to the Agreement, a court may stay the litigation

10

with respect to all the parties under the doctrine of abstention. *See Creative Foods of Ind., Inc. v. My Favorite Muffin, Too, Inc.*, No. IP01-0228-C-T/G, 2002 WL 244577, at *4 (S.D. Ind. Jan. 14, 2002) (relying on *IDS Life Ins. Co. v. Sunamerica Co.*, 103 F.3d 524, 529-30 (7th Cir. 1997), to stay litigation against the defendants, including non-parties to the arbitration agreement). Although Tarrson indicates that the liability of the non-movant defendants is "independent" of the liability of the movant defendants (Pl. Supp. Resp. at 2), based on its review of Tarrson's counts in her complaint, the court finds otherwise. The court, therefore, proceeds to address the petition to stay the litigation.

Under § 3 "a district court, when presented with an application for a stay of proceedings pending arbitration, must grant the requested stay where two conditions are satisfied: (1) the issue is one which is referable to arbitration under an agreement in writing for such arbitration, and (2) the party applying for the stay is not in default in proceeding with such arbitration." *C. Itoh & Co. (Am.) Inc. v. Jordan Int'l Co.*, 552 F.2d 1228, 1231 (7th Cir. 1977). The court will stay an action in order to prevent duplicative proceedings where a party has already commenced an arbitration. *Briggs & Stratton Corp. v. Local 232, Int'l Union, Allied Indus. Workers of Am. (AFL-CIO)*, 36 F.3d 712, 715 (7th Cir. 1994). For the same reasons why the Agreement covers the underlying dispute, the instant case is referable to arbitration under the Agreement. Further, there is no evidence that movant defendants are in default in proceeding with arbitration. The court, therefore, will grant movant defendants' petition to stay the instant litigation with respect to all parties.

## ORDER

Movant defendants' renewed petition to compel arbitration and to stay the litigation is granted [#7]. This case is stayed pending resolution of the arbitration.

ENTER: _____
JOAN HUMPHREY LEFKOW
United States District Judge

Date: February 13, 2003